JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

TRACIE L. BROWN (CSBN 184339)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7200
    Facsimile: (415) 436-7234
    E-mail:    Tracie.Brown@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 03-205 WHA |
|     Plaintiff, | |
| v. | **STATUS REPORT AND [PROPOSED] ORDER RE EVIDENTIARY HEARING** |
| JULIUS BARNETT, | Hearing Date: March 15, 2010 |
|     Defendant. | |

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER

**TABLE OF CONTENTS**

I. Factual Background... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A. Underlying Conviction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B. Prior Form 12s... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Legal Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A. Burden of Proof... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B. Confrontation Clause.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      C. Hearsay Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. Evidentiary Hearing – Day 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A. Summary of the Defendant's Testimony. . . . . . . . . . . . . . . . . . . . . . . . 7

      B. Summary of Deputy U.S. Marshall Scott Fiegelson's Testimony... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV. The Government's Investigation Regarding "Antonio.". . . . . . . . . . . . . . . . . . . 9

V. New Bridge's Confidentiality Rules.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI. New Bridge Staff Statements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A. Angela Porter – Staff Counselor... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B. Claudius Johnson – Director of Operations.. . . . . . . . . . . . . . . . . . . 13

      C. Dr. Bill Coysh – Senior Therapist... . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      D. Peter Budlong – Director of Admissions/Outreach.. . . . . . . . . . . . . 14

VII. Request.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Crawford v. Washington*, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Morrissey v. Brewer*, 408 U.S. 471 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Collins*, 109 F.3d 1413 (9th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Comito*, 177 F.3d 1166 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Grandlund*, 71 F.3d 507 (5th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Hall*, 419 F.3d 980 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Lloyd*, 566 F.3d 341 (3rd Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Murphy*, 2009 WL 2132662 at 1 (4th Cir. 2009).. . . . . . . . . . . . . . . . . . . . 6

*United States v. Perez*, 526 F.3d 543 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Rondeau*, 430 F.3d 44 (1st Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Smith*, 500 F.3d 27 (1st Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Verduzco*, 330 F.3d 1182 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Walker*, 117 F.3d 417 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

## FEDERAL STATUTES, RULES AND, REGULATIONS

18 U.S.C. § 3583(e)(3).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 922(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G. § 5K1.1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 C.F.R. Part 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 C.F.R. § 2.1(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 C.F.R. § 2.1(b)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 C.F.R. § 2.13(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 C.F.R. § 2.13(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 C.F.R. §§ 2.1(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

TRACIE L. BROWN (CSBN 184339)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7200
    Facsimile: (415) 436-7234
    E-mail:    Tracie.Brown@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br>     Plaintiff, ) <br> ) <br>     v. ) <br> ) <br> JULIUS BARNETT, ) <br> ) <br>     Defendant. ) <br> _____ ) | No. CR 03-205 WHA <br><br> **STATUS REPORT AND [PROPOSED] ORDER RE EVIDENTIARY HEARING** <br><br> Hearing Date: March 15, 2010 |

     The United States presents this Status Report to provide the Court and the defense an update on the facts and law relevant to the March 15, 2010 evidentiary hearing.

**I.**    **Factual Background**.

     A.    <u>Underlying Conviction</u>.

     The Defendant was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). According to both the government's and the Defendant's sentencing memoranda, his guidelines at the time were calculated as follows:

        Offense Level (post-acceptance):    21

        Criminal History Category:    VI (16 points)

        Range:    77-96 months

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER

On February 16, 2005, the Defendant was sentenced to 40 months in prison, pursuant to a § 5K1.1 motion by the government.

B. Prior Form 12s.

The Probation Office has filed numerous Form 12s on the Defendant since his supervision commenced, as follows:

(1) On September 18, 2006, pursuant to the Probation Office's first Form 12, the Court took judicial notice that the Defendant had failed to report for scheduled drug counseling sessions and urinalysis testing.

(2) On November 3, 2006, the Probation Office issued a second Form 12. The Probation Office amended this second Form 12 on November 15, 2006. On December 5, 2006, the Defendant admitted that he violated the terms of his supervised release by selling an undercover police officer supposed crack cocaine that was later determined to be bunk. The Defendant's supervised release conditions were amended to include 8 months at Cornell Corrections.

(3) On February 21, 2007, the Court took judicial notice of a positive cocaine test pursuant to a third Form 12.

(4) On March 2, 2007, the Probation Office issued a fourth Form 12, and this Court issued a summons. On March 13, 2007, the Defendant appeared before Judge Spero and was ordered to appear before this Court on March 20, 2007. He failed to do so, and a bench warrant was issued. On March 27, 2007, the Defendant appeared, and another hearing was set for March 30, 2007. The Defendant again failed to appear, and another bench warrant was issued. It is not clear from the docket sheet whether or how this Form 12 was resolved.

(5) According to what can be discerned from the docket sheet, the Defendant was arrested months later – in October 2007, apparently pursuant to a fifth Form 12 filed on September 10, 2007. On October 23, 2007, the Defendant admitted charge 1 of the fifth Form 12 (which contained six charges, including an allegation that he was terminated from his 8-month sentence at Cornell

|   |   |   |
|---|---|---|
| 1 | | Corrections for testing a .10 on a breathalyzer test, as well as two allegations of |
| 2 | | committing federal, state, or local crimes).  The Defendant was sentenced to one |
| 3 | | year and one day of custody on October 23, 2007. |
| 4 | (6) | On December 10, 2008, the Probation Office filed a sixth Form 12 on the |
| 5 | | Defendant, alleging (a) that he failed to report to the Probation Office as directed |
| 6 | | on three occasions; and (b) that he was terminated from his drug treatment |
| 7 | | provider, Sharper Future, for failing to report for drug testing five times, and |
| 8 | | failing to report for drug treatment on three occasions.  This Form 12 was set for a |
| 9 | | final hearing before this Court on January 20, 2009. |
| 10 | (7) | On January 14, 2009, the Probation Office amended the sixth Form 12 (originally |
| 11 | | filed on December 10, 2008), to add four new allegations, including three charges |
| 12 | | relating to reckless driving and in possession of suspected marijuana and cocaine, |
| 13 | | as well as one charge relating to his failure to report to Probation when directed. |
| 14 | (8) | On January 20, 2009, the Defendant failed to appear as directed, and was shortly |
| 15 | | thereafter arrested pursuant to a warrant.  On March 11, 2009, the Defendant |
| 16 | | admitted four of the six charges in the amended sixth Form 12, and – over the |
| 17 | | government's objection – was sentenced to 8 months in custody and 3 months at a |
| 18 | | residential drug treatment facility, "to commence immediately following the term |
| 19 | | of imprisonment."  *See* March 11, 2009 Judgment, p.5 (docket entry 91). |
| 20 | (9) | On November 13, 2009, the Probation Office issued a seventh Form 12, |
| 21 | | containing two allegations: (a) that the Defendant failed to report to Probation |
| 22 | | within 72 hours of his release from custody, instead reporting 20 days later; and |
| 23 | | (b) that the Defendant tested positive for cocaine (and he admitted using both |
| 24 | | cocaine and marijuana).  Notably, this seventh Form 12 occurred before the |
| 25 | | Defendant had even completed his sentence on the sixth Form 12, in that he had |
| 26 | | not even yet begun his three-month stay at a drug treatment facility as ordered. |
| 27 | (10) | On December 7, 2009, the Probation Office submitted an amended seventh Form |
| 28 | | 12, adding the following allegations: (a) an additional positive drug test, and (b) a |

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER            3

failure to follow the directions of the Probation Officer (in that he failed to remain at home for a visit, as directed).[1]

(11)  On December 9, 2009, the parties appeared before this Court, which ordered the Defendant to report the following day to the New Bridge treatment facility for a 97-day stay (which would then complete his sentence on the sixth Form 12), holding in abeyance disposition of the amended seventh Form 12 until a status hearing set for March 23, 2010.

(12)  On December 16, 2009, the Probation Office again amended the seventh Form 12, adding allegations regarding: (a) an additional positive drug test; (b) the Defendant's failure to appear to New Bridge on December 10, 2009, as directed by the Court;[2] (c) the Defendant's failure to report to the detox facility, as directed by the Probation Officer.

(13)  The Defendant was supposed to appear for a status hearing before this Court on December 22, 2009; he again failed to appear.  A bench warrant was issued.  The U.S. Marshals Service attempted to arrest the Defendant on the warrant; he originally told the U.S. Marshals Service that he would turn himself in, and then failed to do so.

(14)  The Defendant appeared before this Court on January 5, 2010.  He was again directed to report to the New Bridge treatment facility the following day, to complete his sentence on the sixth Form 12, again leaving open the disposition of the seven supervised release violations charged in the seventh Form 12 (which was originally filed on November 13, 2009, and amended on December 7 and 16, 2009).  He reported to New Bridge on January 6, 2010, as directed.

(15)  On February 2, 2010, the Probation Office filed an eighth Form 12, containing

---

[1]  This amended seventh Form 12 was filed by the Court on December 11, 2009.

[2]  The Defendant reported to New Bridge on December 11, 2009, but was not admitted at that time because he needed to detox from the painkillers he was taking.

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER          4

two allegations relating to the Defendant's alleged assault on another individual seeking treatment at New Bridge.

Accordingly, this Court has before it (1) the Defendant's failure to complete his sentence on the sixth Form 12; (2) all seven allegations in the seventh Form 12; and (3) the two allegations in the eighth Form 12.[3]

## II.     Legal Background.

### A.     Burden of Proof.

Pursuant to 18 U.S.C. § 3583(e)(3), the United States bears the burden of proving a supervised release violation by a preponderance of the evidence. The preponderance standard is met if the relevant fact is more likely true than not. *United States v. Collins,* 109 F.3d 1413, 1420 (9th Cir. 1997).

### B.     Confrontation Clause.

As the Supreme Court and the Ninth Circuit have recognized, because a supervised release revocation is not a criminal prosecution, the "full panoply of rights" to which a defendant is entitled in a criminal prosecution do not apply to post-conviction revocation hearings. *See Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) (discussing limited rights in parole revocation hearings); *United States v. Hall*, 419 F.3d 980, 985 (9th Cir. 2005) (quoting *Morrissey,* and noting that revocation of parole, supervised release, and probation are "constitutionally indistinguishable and analyzed in the same manner").

In light of the limited due process rights afforded supervised releasees during revocation hearings, the Ninth Circuit has squarely held that the right to confront testimonial witnesses announced in *Crawford v. Washington*, 541 U.S. 36 (2004), does not apply to supervised release hearings. *Hall*, 419 F.3d at 985. *See also, e.g.*, *United States v. Rondeau*, 430 F.3d 44, 47-48

---

[3] It should be noted that the Defendant's counsel believes the Defendant admitted one of the alleged violations in the seventh Form 12. However, the docket sheet, the Court's minute entries (docket entries 101, 105, and 111), as well as the undersigned AUSA's personal notes of the proceedings on the seventh Form 12 do not reflect any such admission. Instead, the government believes that the seventh Form 12 was held entirely in abeyance during the 3-month period the Defendant was to stay at New Bridge, with a status date set for March 23, 2010.

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER          5

(1st Cir. 2005) ("We therefore join several other circuits in concluding that, because a supervised release hearing is not a 'criminal prosecution' *Crawford* does not apply" (collecting cases from the 9th, 6th, and 8th circuits)).

      C.      <u>Hearsay Evidence</u>.

Similarly, the Ninth Circuit, joined by numerous other circuits, has repeatedly held that the Federal Rules of Evidence do not apply to proceedings to revoke supervised release. *See United States v. Verduzco*, 330 F.3d 1182, 1185 (9th Cir. 2003); *United States v. Walker*, 117 F.3d 417, 421 (9th Cir. 1997).[4] This holding comports with Federal Rule of Evidence 1101(d)(3), which explicitly states that the Rules of Evidence are not applicable to parole revocation proceedings.[5]

The Ninth Circuit has also held that hearsay evidence is properly admitted at a supervised release hearing if it is reliable. *See, e.g. Walker,* 117 F.3d at 421; *see also Hall*, 419 F.3d at 985 (due process standard used to evaluate whether hearsay evidence is properly admitted). In determining the admissibility of hearsay evidence, the Court must conduct a balancing test, weighing the defendant's of right to confrontation against the Government's good cause for denying that right. *United States v. Comito*, 177 F.3d 1166, 1170 (9th Cir. 1999) (citing *Walker*, 117 F.3d at 420). The weight of the defendant's right depends on "(1) the importance of the evidence to the district court's ultimate findings; (2) the nature of the facts to be proven by the hearsay; and (3) whether the [defendant] had any opportunity to refute the evidence." *United*

---

[4] *See, e.g.*, *United States v. Smith*, 500 F.3d 27, 31 (1st Cir. 2007) (Federal Rules of Evidence do not apply in a supervised release hearing); *United States v. Lloyd*, 566 F.3d 341, 343-44 (3rd Cir. 2009) (Federal Rules of Evidence do not apply at supervised release hearings and reliable hearsay is admissible); *United States v. Murphy*, 2009 WL 2132662 at 1 (4th Cir. 2009) (same); *United States v. Grandlund*, 71 F.3d 507, 509-10 (5th Cir. 1995) (recognizing same).

[5] Although the Rule specifically mentions parole revocation and not supervised release proceedings, as noted above, the Ninth Circuit has held that revocation of parole, supervised release, and probation are "constitutionally indistinguishable and analyzed in the same manner." *Hall*, 419 F.3d at 985; *see also Walker,* 117 F.3d at 420 (noting that, for purposes of applying the evidentiary rules, any difference between probation revocation and supervised release revocation is "inconsequential.").

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER      6

*States v. Perez*, 526 F.3d 543, 548 (9th Cir. 2008). If that balancing test weighs in favor of the government, then reliable hearsay evidence is admissible. *Walker,* 117 F.3d at 421.

### III.   Evidentiary Hearing – Day 1

On February 9, 2010, the Court heard testimony from two witnesses regarding the allegations in the eighth Form 12 (filed February 2, 2010), which relates to the Defendant's termination from the New Bridge treatment facility due to a physical altercation with another New Bridge client.

####   A.   Summary of the Defendant's Testimony.[6]

As the Court may recall, the Defendant testified generally as follows:

- Within the first two hours of his arrival at New Bridge, the Defendant felt a "vibe" that he was going to have problems with another New Bridge client, "Antonio Maurier," an alleged member of the "Big Block" gang against whom the Defendant had provided information, pursuant to U.S.S.G. § 5K1.1.[7] Because of this negative vibe, he immediately spoke to a New Bridge staff member named "Bill," informing Bill of his (the Defendant's) prior cooperation against Antonio, and letting Bill know that he was concerned that he and Antonio might have problems because of this history. Bill allegedly informed the Defendant that he should stay in the program because there was a no violence policy and that what was in the past, would stay in the past.

---

[6] The government has requested an expedited transcript of Day 1 of the evidentiary hearing. Unfortunately, because the court reporter for this evidentiary hearing is also the court reporter for the *United States v. Gregory Reyes* stock options backdating trial pending in front of Judge Charles R. Breyer, the court reporter is not sure whether the transcript will be available by March 15, 2010. This summary, therefore, is based on the undersigned AUSA's notes and best recollection of the testimony at Day 1 of the evidentiary hearing, and is intended only to set forth certain highlights of the testimony. It does not purport to contain all of the information conveyed by the two testifying witnesses.

[7] "Maurier" represents the government's best guess as to Antonio's last name. As set forth more fully in Sections IV and V, below, the government has not been able to determine the identity of the person whom the Defendant identified as "Antonio Maurier" at Day 1 of the evidentiary hearing.

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER            7

- Some time later, Antonio told the Defendant that he knew the Defendant had cooperated against him. The Defendant did not bring this to the attention of any New Bridge staff or his Probation Officer.
- Either two days before the altercation, or possibly on the night of the altercation (the Defendant's testimony seemed to change on this point), Antonio told the Defendant something to the effect of, "I don't know how you can sleep at night" or "I don't know how you can sleep like this," which the Defendant perceived as threatening. The Defendant did not bring this to the attention of any New Bridge staff or his Probation Officer.
- At approximately 10 p.m. on the night of the altercation, the Defendant was minding his own business in his room when Antonio came in to use the bathroom that was part of the Defendant's bedroom – a bedroom that the Defendant shared with at least one other New Bridge client, referred to as "George M.C." Antonio demanded that the Defendant give him a whole pack of the Defendant's cigarettes. The Defendant declined to accede to this demand, but instead offered Antonio a cigarette. The Defendant and Antonio's voices were raised as they were arguing over the cigarettes, and Antonio shoved the Defendant. The Defendant then shoved Antonio in response, at which point Antonio shoved the Defendant a second time. The two men then began wrestling, and fell to the ground.
- An unidentified New Bridge client who witnessed the fight went to report the incident. Antonio and the Defendant were thereafter pulled apart, and were both told that they should go see "Angela," the New Bridge staff member on duty that evening. The Defendant stopped into the bathroom before heading down to Angela's office; he estimated that he arrived there perhaps a minute or so after Antonio.
- The Defendant told Angela that he was just engaging in horseplay with Antonio. He did not tell Angela that his physical contact with Antonio was self defense, because he thought he would have a better chance of staying in the program if he

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER           8

said it was just horseplay.

- The Defendant never hit Antonio. (The Defendant so testified in response to questions from both the prosecutor and the Court.)
- Antonio left New Bridge the morning after the altercation, while the Defendant remained in "time out."
- The first time the Defendant ever mentioned self-defense was when he made the claim to Deputy U.S. Marshal Scott Fiegelson on the evening of his arrest, February 2, 2010.

B. <u>Summary of Deputy U.S. Marshall Scott Fiegelson's Testimony</u>.

When the Defendant testified that, on the evening of his arrest, he told Deputy Fiegelson it was self defense, Deputy Fiegelson – who was seated in the courtroom next to the Defendant on the witness stand – immediately looked surprised and began shaking his head as if to say, "No, not true." When Deputy Fiegelson took the stand, he testified that the Defendant definitely did <u>not</u> mention self defense on the night of his arrest, and only mentioned it days later – immediately prior to a court appearance. Deputy Fiegelson was not certain whether the Defendant's first mention of the self-defense theory was before his initial appearance in Magistrate Court (on February 5, 2010) or before the evidentiary hearing that very day (February 9, 2010).

**IV. The Government's Investigation Regarding "Antonio."**

Since Day 1 of the evidentiary hearing on February 9, the undersigned AUSA has been trying, unsuccessfully, to determine who victim-witness "Antonio Maurier" is. Numerous searches on both PACER and the U.S. Attorney's Office's own internal database revealed no name that is even close to anything resembling "Antonio Maurier." The undersigned AUSA also contacted the prior prosecutor on the case to see whether he might have some idea who "Antonio Maurier" was, to no avail. The name did not sound at all familiar to the former AUSA, who rattled off several other names of individuals against whom the Defendant provided information (none of which sounded remotely like "Antonio Maurier").

The undersigned AUSA then retrieved the original U.S. Attorney's Office case file from

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER          9

1  the Federal Records Center in St. Louis, Missouri, in the hope that the case file might contain
2  information that could be used to identify "Antonio Maurier." This search, too, was
3  unsuccessful, as the case file does not contain interview reports of any proffer sessions, and as
4  the sentencing memoranda filed by the government and the Defendant in the underlying case do
5  not specify the names of individuals regarding whom the Defendant provided information. The
6  undersigned AUSA then contacted ATF, the agency involved in the original prosecution of the
7  Defendant, and asked the agency to retrieve its case file. Unfortunately, there was no proffer
8  information in the ATF case file either, and the agent who was assigned to the Defendant's case
9  is no longer with ATF. Finally, the undersigned AUSA contacted a sergeant on the SFPD's gang
10 task force, in the hope that the name "Antonio Maurier" might sound familiar to someone with
11 intimate knowledge of the Big Block gang. That effort, too, was unavailing, as the name rang no
12 bells.
13      Thus, despite extensive efforts to determine the identity of the "Antonio" with whom the
14 Defendant had the altercation, the government currently has no idea who exactly "Antonio"
15 might be, and whether the Defendant in fact provided information against him.
16 **V.    New Bridge's Confidentiality Rules.**
17      On February 23, 2010, the undersigned AUSA and Probation Officer Chris Taylor met
18 with four staff members of New Bridge: Angela Porter, Dr. Bill Coysh, Peter Budlong, and
19 Claudius Johnson. Peter Budlong, Director of Admissions/Outreach, stated that New Bridge
20 could not provide the names of "Antonio" and any of the witnesses to the altercation, pursuant to
21 federal regulations that protect the confidentiality of alcohol and drug abuse patient records. *See*
22 42 C.F.R. Part 2.
23      These regulations, which govern New Bridge because of its contract with U.S. Probation,
24 state that "[r]ecords of the identity ... of any patient which are maintained in connection with the
25 performance of any drug abuse prevention function conducted, regulated or directly or indirectly
26 assisted by any department or agency of the United States, shall ... be confidential." 42 C.F.R.
27 § 2.1(a). Because the prohibition against disclosure applies to records "concerning any
28 individual who has been a patient, irrespective of whether or when he ceases to be a patient," it is

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER       10

irrelevant that "Antonio" is no longer a New Bridge client. *See* 42 C.F.R. §§ 2.1(d), 2.2(d). Moreover, there is no exception to this prohibition when disclosing for use in a criminal proceeding conducted by any federal authority. *See* 42 C.F.R. § 2.13(a). Furthermore, the regulations apply "whether the holder of the information believes that the person seeking the information already has it, has other means of obtaining it, is a law enforcement or other official, has obtained a subpoena, or asserts any other justification for a disclosure." 42 C.F.R. § 2.13(b).

The records may only be disclosed:

> [I]f authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

42 C.F.R. § 2.1(b)(2)(C). As set forth in more detail below, Peter Budlong made the seemingly common-sense point that it would be "devastating" to New Bridge's ability to treat drug-addicted individuals if clients felt that their privacy and confidentiality rights could be overridden for a supervised release violation hearing or any other criminal justice purpose.

**VI.    New Bridge Staff Statements**.

As noted above, the government and the Probation Officer met with four staff members of New Bridge after Day 1 of the evidentiary hearing. Brief summaries of the highlights of those interviews follow:[8]

A.    <u>Angela Porter – Staff Counselor</u>.

- Ms. Porter was the staff member on site on the evening of February 1, 2010, when the altercation took place. She was in her office when Antonio[9] came down to see

---

[8] These summaries are based on the undersigned AUSA's recollections and notes of the meeting, and have not been reviewed and approved by the witnesses themselves.

[9] For ease of reference, this Status Report refers to this individual as "Antonio," the name Mr. Barnett used when testifying. It should be noted, however, that – because of the confidentiality regulations set forth above – the New Bridge staff consistently referred to this

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER        11

her. Antonio was very upset and teary, and told Ms. Porter that the Defendant had punched him three times in the stomach and had tried to "body-slam" him. Antonio further stated that he wanted to go to the hospital due to the pain, and wanted to call the police.

- Ms. Porter knew Antonio to be "dramatic" in his behavior generally; thus, she first attempted to diffuse the situation by getting Antonio to calm down. She then asked him to tell her more clearly what happened. Antonio did so. She had no reason to doubt his veracity.

- After Antonio related his story in a calmer manner, Ms. Porter asked another New Bridge client to go get the Defendant. She estimated that it was approximately 10-15 minutes between the time Antonio came to her office and the time the Defendant came down.

- Ms. Porter asked the Defendant what had happened. He said, "Nothing." She repeated her question, and he responded the same way. The Defendant then looked over at Antonio, and said, "What did you tell her?" Antonio responded, "I told her what happened." A back-and-forth between the Defendant and Antonio then ensued.

- Ms. Porter again asked the Defendant to tell her what happened, and inquired whether he had hit Antonio. The Defendant admitted that he hit Antonio three times in the stomach, and called Antonio a "punk" who had "disrespected" the Defendant.[10]

- The Defendant also admitted that during the altercation, he picked up Antonio and they started wrestling. The Defendant then claimed that they were engaging in horseplay. Antonio did not agree that it was merely horseplay.

---

person as "Client 1."

[10] Obviously, the Defendant's admission on the night of the incident not only constitutes non-hearsay pursuant to Federal Rule of Evidence 801(d)(2)(A), it also contradicts his sworn testimony on Day 1 of the evidentiary hearing that he never hit Antonio.

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER         12

- Ms. Porter separated the two for the evening. Ms. Porter spoke to the Defendant at least once after the meeting in the office. He asked her, "What's going to happen?" He also made clear several times that he wanted to stay in the program, and said, "Please don't throw me out." Ms. Porter believes that the Defendant was earnest in his efforts at New Bridge.
- Ms. Porter reported the incident to her supervisor, Suzanne Hicks, and wrote the report attached hereto as Exhibit 1.
- The Defendant never claimed to Ms. Porter that he was acting in self defense. If he had said that, Ms. Porter believes would not have been discharged from the program.

B. <u>Claudius Johnson – Director of Operations</u>.

- Mr. Johnson was driving to New Bridge the morning after the incident, when he saw Antonio walking down the street away from New Bridge. Upon arriving to work, he learned the details of the altercation (for example, by reading Ms. Porter's report), and that Antonio had decided to leave the program when he learned he would be placed on a time out. Mr. Johnson stated that clients frequently leave the program when they learn they will be placed on a time out.
- Mr. Johnson spoke with the Defendant, who claimed that he and Antonio were engaging in horseplay.
- Mr. Johnson interviewed two witnesses to the altercation between the Defendant and Antonio. Witness 1, who was in the room at the time of the incident, enacted the altercation for Mr. Johnson, and stated that the Defendant had punched Antonio three times in quick succession.
- Witness 2, who was lying in bed in the room at the time of the incident, was reluctant to be involved in the investigation; Mr. Johnson described Witness 2 as a "see no evil, hear no evil type," and further stated that it was like "pulling teeth" to get Witness 2 to discuss the incident. According to Mr. Johnson, Witness 2 stated that he thought it was horseplay, and claimed not to have seen any

punching.[11]

- Mr. Johnson then reported the results of his interviews to Suzanne Hicks, the Program Director. Ms. Hicks made the decision to terminate the Defendant from the program, and Mr. Johnson supported that decision in light of all he had learned.

C.   Dr. Bill Coysh – Senior Therapist.

- Dr. Coysh is the only "Bill" at New Bridge; thus, he is the only person to whom the Defendant could have been referring when he testified that, within hours of his arrival at New Bridge, he notified "Bill" that he felt a bad vibe from Antonio, and feared problems because of his prior cooperation against Antonio.

- Dr. Coysh was certain that the Defendant never said anything about his prior cooperation against Antonio, and never disclosed any negative feelings between himself and Antonio.

- Indeed, Dr. Coysh related that the first time he became aware that the Defendant even knew Antonio prior to their stay at New Bridge was only a day or two before the February 1, 2010 altercation. Dr. Coysh recalled that, after a particularly "intense" group therapy session, during which Antonio had behaved in an aggressive or combative manner, the Defendant pulled Dr. Coysh aside and said something to the effect of, "Don't worry [about Antonio]. I know that guy from the 'hood. He's an OK guy, he's a young buck." Dr. Coysh understood the Defendant's statement to indicate that he (the Defendant) would take Antonio under his wing, and was thus quite far from a suggestion that the Defendant and Antonio had had past problems.

D.   Peter Budlong – Director of Admissions/Outreach.

Mr. Budlong was made aware of the incident between Antonio and the Defendant, but

---

[11] Pursuant to the confidentiality regulations discussed above, New Bridge staff declined to provide any identifying information regarding Witnesses 1 and 2. New Bridge staff further declined to answer whether either Witness 1 or 2 was known as "George M.C."

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER         14

was not directly involved in its investigation. He made clear to the government and the Probation Officer, however, that a Court order requiring New Bridge to disclose identifying information for Antonio, Witness 1, and Witness 2 would have a "chilling effect" that could be "devastating" on New Bridge's ability effectively to treat drug-addicted people. Mr. Budlong made the unsurprising comment that New Bridge clients need to feel confident that what happens at New Bridge is protected from law enforcement inquiry.

In addition, Mr. Budlong agreed with Ms. Porter that, had the Defendant stated that he was acting in self defense, he would not have been discharged from the program.[12]

## VII. Request.

The Court has scheduled Day 2 of the evidentiary hearing on March 15, 2010 at 12:00 noon. However, the Court's website shows that it has a scheduled a motions hearing on a multi-defendant case at 12:30 on the same date.

In light of all of the above – including the Defendant's non-hearsay admissions as set forth in the report of Angela Porter, attached as Exhibit 1, and the inapplicability of the *Crawford* Confrontation Clause ruling to these proceedings – the government respectfully requests that the Court order as follows:

(1) that the March 15, 2010 evidentiary hearing be taken off calendar, so that the multiple witnesses from the New Bridge treatment facility need not travel from Berkeley to San Francisco for what may be a very brief appearance;

(2) that the Court permit the government to submit Declarations from the above-named witnesses on or before March 15, 2010, and require live testimony only if, after review of the Declarations, the Defendant can articulate a basis for meaningful cross-examination;

(3) that, based on the above-described facts, there is no "good cause" for overriding the

///

///

---

[12] The undersigned AUSA's best recollection is that Mr. Budlong made this statement; it is possible, however, that it was Mr. Johnson who agreed with Ms. Porter's assessment.

CR 03-205 WHA
STATUS REPORT & [PROP.] ORDER         15

governing confidentiality regulations and requiring New Bridge to disclose the names of "Antonio," Witness 1, and Witness 2.

DATED: March 5, 2010                    Respectfully submitted,

JOSEPH P. RUSSONIELLO
United States Attorney


_/s/_____
TRACIE L. BROWN
Assistant United States Attorney

## [~~PROPOSED~~] ORDER

Based on the Status Report submitted by the United States, and good cause appearing, it is hereby ordered that:

(1) The March 15, 2010 evidentiary hearing is VACATED;

(2) In lieu of live testimony, the government shall submit Declarations from (a) Angela Porter, (b) Claudius Johnson, (c) Dr. Bill Coysh, and (d) Peter Budlong, on or before March 15, 2010;

(3) After reviewing the Declarations, the Defendant shall submit – on an *ex parte* basis, if desired – a proffer regarding his proposed cross-examination of the above-named witnesses, on or before March 22, 2010;

(4) After reviewing the Declarations and the Defendant's submission, the Court shall issue an order setting a new date for either (a) live testimony from some or all of the above-named witnesses, or (b) other hearing regarding the disposition of the pending Form 12s; and

(5) There is no good cause for overriding the governing confidentiality regulations, and thus New Bridge will not be required to disclose the names of any New Bridge clients (current or former) who were witnesses to the events of February 1, 2010.

DATED: March 10, 2010

_____
THE HON. WILLIAM ALSUP
United States District Judge

IT IS SO ORDERED
Judge William Alsup

CR 03-205 WHA
STATUS REPORT & [~~PROP.~~] ORDER          16